**William GOMEZ, Respondent–Appellant,**

**v.**

**CONSTRUCTION DESIGN, INC., Appellant–Respondent.**

No. SC 85115.

Supreme Court of Missouri, En Banc.

Jan. 13, 2004.

Rehearing Denied Feb. 24, 2004.

Douglas N. Ghertner, John M. Graham, Jr., Kansas City, for Appellant-Respondent.

Candis L. Young, Kansas City, for Respondent-Appellant.

WILLIAM RAY PRICE, JR., Judge.

## I.

William Gomez received a jury award of $3.76 million in a negligence action against Construction Design, Inc. ("CDI"). The trial court remitted that award to $2.76 million and conditionally granted CDI a new trial if Gomez declined to accept the

remitted award. Gomez accepted the reduced amount, and CDI appeals. Gomez cross-appeals, claiming that the remittitur was improper. The judgment is affirmed.

## II.

### A.

Gomez was working for TMS, Inc., a pipefitting company, on May 2, 1994, when he was injured. Gomez was employed as a pipefitter helper, and his duties included carrying tools, pipes, and bolts, in addition to other miscellaneous tasks. TMS employees were working alongside other contractors in a soybean plant that was temporarily closed for repairs and modifications.

Immediately preceding the accident, two CDI employees were attempting to lift and move a heat exchanger that weighed approximately one ton. They used chains connected to pulleys to lift the exchanger, which they planned to move a few feet. At the same time, TMS employees were attempting to build a scaffold for a welder. Gomez was bringing planks one at a time from a stack in one corner to where they were erecting the scaffold.

The CDI employees pulled the chains and raised the heat exchanger from the ground, but a flange on the bottom of the exchanger caught the grated floor beneath it as the exchanger was being lifted, and the grating moved. Part of the grating fell open to the next floor below, swinging like a gate or a trap door but still attached to the floor at the top, creating a hole in the floor approximately two or three feet square.

Shortly after the hole was exposed, Gomez attempted to cross the floor to deliver another plank. He traversed the same path he had previously used to access the scaffold and walked past a CDI employee who had moved to examine the exposed area where he and his partner had moved the grating.

Gomez fell through the hole and landed approximately 20 feet below on the next floor. He landed on the left side of his body and injured his left arm, shoulder, and wrist. He also experienced blunt head trauma from the fall. Doctors performed carpal tunnel surgery and inserted five screws and a plate in his left forearm. Doctors also performed surgery on Gomez's left malar area to reconstruct his left orbital.

Further medical treatment was recommended for Gomez, who was 39 years old when the accident occurred. An internist testified that Gomez would benefit from surgery on a herniated disk to alleviate some of his low back pain. A dentist suggested treatment including splint therapy, physical therapy, chronic pain evaluation and management, jaw surgery, and medication to manage pain. The splint therapy would require Gomez to visit the dentist for indefinite checkups in increments of two weeks initially and increasing to three months.

Gomez suffered numerous mental and other problems from the fall as well. He now stutters and has extreme problems enunciating. Difficulty in adjusting to his physical ailments has caused him anxiety and depression. He has dementia, which means his abilities to think, concentrate, and remember are diminished. Specifically, he cannot remember new information for longer than a few seconds, and he cannot properly process the information he hears. He often has headaches, feels dizzy, and hears a ringing in his ears several times a day. He cannot drive more than approximately 10 to 20 minutes at a time, and he must sit and stand in short increments as necessary to alleviate discomfort.

Since the fall, Gomez is afraid of heights and does not sleep well. His loss of sleep occurs partly from an inability to remain physically comfortable but also because he repeatedly dreams about the fall. He is unable to participate in many of the hobbies he previously enjoyed, such as fishing, attending sporting events, and lifting weights. His son and a coworker testified that his personality has changed since the accident, saying he was free-spirited before but now is often frustrated and becomes easily irritated. When asked about pain, he said, "[O]verall, my whole body hurts." He told one doctor that pain spreads throughout his entire body, especially his low back, neck, and hips, after approximately 15 minutes of activity.

Gomez has been unemployed since the fall, and a vocational analyst testified that the accident rendered him "totally vocationally disabled." He was encouraged to seek psychological treatment to improve his self-esteem, alleviate his depression, decrease his anxiety, and teach him how to adapt to his situation.

Gomez received $235,600 in a worker's compensation award. He also testified that a lien of $110,000 existed against any additional recovery and that he owed approximately $40,000 in medical bills.

### B.

Gomez sued CDI for negligence, and the cause was submitted to a jury on what was purportedly a res ipsa loquitur instruction. The jury returned a verdict of $3.76 million. The trial judge entered an order on May 15, 2001, denying CDI's motion for judgment notwithstanding the verdict ("JNOV") and sustaining its motion for new trial or, in the alternative, for remittitur. The trial court remitted the verdict

to $2.76 million, conditioned upon Gomez's acceptance of the remitted amount.

The order stated that if he refused to accept the lower amount, a new trial would be granted, but if he was satisfied with the new award, "then so shall the court be satisfied." The order [1] allowed Gomez "up to and including 4:30 P.M. on Friday, May 25, 2001 to file a written acceptance of the remitted amount," and it stated that "if written acceptance is so filed," the motion for a new trial would be overruled and judgment for $2.76 million would be entered.

Gomez faxed his acceptance of the remitted amount to the Circuit Court of Jackson County on May 25, 2001, at 8:34 a.m. The acceptance was filed by the court on May 31. The trial court entered an order and amended judgment dated May 31 that was filed on June 11. The order and amended judgment overruled CDI's motion for new trial and entered a $2.76 million judgment against CDI.

### III.

#### A.

▮ CDI initially asserts two related claims of error. It alleges that manifest injustice occurred because the case was submitted on an erroneous instruction. It also argues that, because Gomez introduced insufficient evidence to submit the case to the jury, its motions for directed verdict at the close of Gomez's evidence and after its evidence were erroneously overruled.

▮ The verdict director upon which the case was submitted reads:

In your verdict you must assess a percentage of fault to defendant, wheth-

---

1. The trial court entered an amended order on May 24, 2001. The only change was to correct the deadline date for remittitur. The original order stated a deadline of Thursday, May 25, 2001, whereas the amended order provided a deadline of Friday, May 25, 2001.

er or not plaintiff was partly at fault, if you believe:

First, the floor grate was dislodged from its supports by employees of the defendant, and

Second, the floor grate fell while plaintiff was standing on it or as he approached it, and

Third, the collapse of the floor grate and plaintiff's fall were directly caused by defendant's negligence,[2] and

Fourth, as a direct result of such negligence, plaintiff sustained damage.

CDI is limited to plain error review because it did not object to the instruction at the instruction conference and in its motion for a new trial. *See* Rule 70.02(c) (error to give instruction in violation of this rule); Rule 70.03 (party may not claim error for giving or failure to give instructions unless party objects before jury retires; party must also raise objections in motion for new trial); Rule 84.13 ("allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case"; plain error may be considered). Timely objections are required as a condition precedent to appellate review in order to afford the trial court an opportunity to correct any mistakes immediately and inexpensively without risking the delay and expense of an appeal and a retrial.

**2.** The previous instruction read to the jury defined "negligent" or "negligence" as "the failure to use that degree of care that an ordinarily careful person would use under the same or similar circumstances."

**3.** In general, the parties do not dispute the manner by which Gomez was injured. They contest, among other issues, whether the actions leading to those injuries were negligent on CDI's part.

**4.** The verdict director for multiple negligent acts, MAI 17.02 [1980 Revision], provides:

**B.**

■ There is no question that the instruction submitted was in error with respect either to negligence or to res ipsa loquitur.[3] As a negligence instruction,[4] it fails to indicate what particular duty CDI owed Gomez or what particular improper act or omission by CDI constituted negligence. Because it fails to include these elements, the instruction amounts to a roving commission. A "roving commission" is an instruction that "assumes a disputed fact or submits an abstract legal question that allows the jury to 'roam freely through the evidence and choose any facts which suited its fancy or its perception of logic' to impose liability." *Seitz v. Lemay Bank and Trust Co.*, 959 S.W.2d 458, 463 (Mo. banc 1998); *see Coon v. Dryden*, 46 S.W.3d 81, 93 (Mo.App.2001) (instruction considered roving commission when it is too general or submits question to jury in broad manner without limitation to facts and law developed at trial). Furthermore, while the requested finding that CDI dislodged the grating and caused it to fall "speaks of some kind of negligence, [it] does not spell out the specific fault." *Welch v. Thompson*, 357 Mo. 703, 210 S.W.2d 79, 85 (1948) (internal quotations and emphasis omitted).

■ In comparison, as a res ipsa loqui-

Your verdict must be for plaintiff if you believe:
First, either:
 defendant failed to keep a careful lookout, or
 defendant drove at an excessive speed, or
 defendant's automobile was on the wrong side of the road, and
Second, defendant, in any one or more of the respects submitted in paragraph First, was thereby negligent, and
Third, as a direct result of such negligence, plaintiff sustained damage.
(footnotes omitted).

tur instruction,[5] the instruction neglects to establish CDI's control of the instrumentality nor does it impart what extraordinary event happened that otherwise would not have occurred had CDI used due care. CDI disputed that the area was under its control at the time of the accident, and the first paragraph of MAI 31.02(3) requires a specific finding by the jury that the defendant possessed control of the instrumentality.

## C.

■ Instructional error, however, does not necessarily establish manifest injustice. In his petition, Gomez pleaded several acts of specific negligence committed by CDI that directly and proximately caused his injuries. He alleged that CDI owed him a duty

to secure the metal grating in a reasonably safe condition, to correct any dangerous conditions of which [it] knew or should have known by the use of reasonable care, to prevent the floor from being pulled out from under [him] and to warn [him] of any dangerous conditions [of] which [it] had or should have had knowledge.

He further pleaded that CDI negligently breached these duties, creating a dangerous circumstance on the premises of which it had actual or constructive knowledge, because it:

 (a) Carelessly and negligently failed to properly inspect the grating;

 (b) Carelessly and negligently caused or allowed the grating to become and

remain in an unfastened, broken, uneven or otherwise defective condition;

 (c) Carelessly and negligently failed to repair the grating; and

 (d) Carelessly and negligently failed to give timely and sufficient warnings of the unfastened, broken, uneven or otherwise defective condition of the grating.

He also contended that the situation was not known or obvious to him nor did he receive any warning of its existence before he fell.

Gomez also introduced evidence at trial sufficient to support a negligence claim. Gomez's foreman, Glen Frost, testified that the area with the heat exchanger, pulleys, and the grating was where CDI was working. Frost stated that when CDI began to lift the heat exchanger, "the flange hooked the grating and pulled it off of its supports," "the grating went out from underneath it, went out from underneath us," and "I grabbed the handrail or I'd of been down there with [Gomez]." If he had received notice that CDI planned to move the heat exchanger that day, he said, "I would have went and looked at what they had and if I needed to get my people out of the way until they got this job finished, I would have done it."

A coworker of Gomez's, Wayne Fry, also testified that the group working next to him, which Frost had identified as CDI employees, was using chains and pulleys to lift the heat exchanger. He stated, when

---

5. MAI 31.02(3) [1997 Revision], the verdict director for res ipsa loquitur, provides:

> Your verdict must be for plaintiff if you believe:
> First, defendant (*here describe defendant's control, right to control, or management of the instrumentality involved* ), and
> Second, (*here describe the occurrence, event or incident, which is alleged to be the type*

*that does not ordinarily happen when those in charge use due care* ), and
> Third, from the fact of such occurrence and the reasonable inferences therefrom, such occurrence was directly caused by defendant's negligence, and
> Fourth, as a direct result of such negligence, plaintiff sustained damage.
> (emphasis in original) (footnotes omitted).

moving the exchanger, "you would want to lift it real slow to prevent it from hanging up on anything, and sometimes there may be something that someone has forgot to unhook so you don't want to ruin a piece of machinery or equipment." Fry said that he heard a commotion and turned to see Gomez falling through the opening in the grating. He testified that he knew CDI employees were in the area because they were operating the chains to lift the heat exchanger, but nobody warned him that they were preparing to lift the heat exchanger.

In addition, a CDI employee testified that someone should have checked to see whether the grating was fastened down before they began moving the heat exchanger, that he knew the hole created by moving the grating was dangerous, that he did not warn Gomez about the hole even though he knew TMS workers were repeatedly walking the same route through the area where the CDI employees were working, and that he had time after the grating moved and before Gomez fell to walk several feet to it and examine it. Most of these statements were also reiterated by another CDI employee.

At a minimum, the above evidence supports that CDI "carelessly and negligently caused or allowed the grating to become and remain in an unfastened, broken, uneven or otherwise defective condition" and that CDI "failed to give timely and sufficient warnings" of the defective condition of the grating.

### D.

As CDI did not dispute that Gomez was injured or how the injury occurred, the sum of the pleadings and evidence equals an adequately pleaded and proved claim for negligence. *See Lopez v. Three Rivers Elec. Co-op.*, 26 S.W.3d 151, 155 (Mo. banc 2000) (plaintiff must prove defendant owed duty to protect plaintiff from injury, defendant failed to perform duty, and plaintiff was injured). The various deficiencies in the instruction could have been easily remedied had CDI desired and made its objection known to the trial court prior to submission. In fact, both of the parties argued the case to the jury as a negligence case in their closing argument.

In such a circumstance, when a negligence case was pleaded and proved, and the parties tried the case as one of negligence, there is no manifest injustice and, accordingly, no plain error in giving this roving instruction. CDI's point on appeal alleging plain error from the faulty instruction is denied, as is its point claiming the trial court erred in denying its motions for directed verdict.

### IV.

■ CDI also asserts that the trial court erred in overruling its objection to Gomez's introduction of a videotape of the scene recorded one day after the accident. It argues that the videotape was prejudicial evidence of post-accident remedial measures and that its admission was improper because it allowed Gomez to depict post-accident remedial measures as evidence that CDI was negligent in failing to warn other workers in the area of the dislodged grating.

Three exhibits of the accident scene were offered by Gomez and admitted at trial: a videotape of the accident scene taken the day after his fall and two photographs lifted from the video that showed the site from different angles. The photos were blurry and of limited, if any, probative value. The videotape was the only remaining visual aid of the accident site for the jury to consider.

■ The trial court has broad discretion in assessing the admissibility of

videotapes, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Egelhoff v. Holt*, 875 S.W.2d 543, 549 (Mo. banc 1994). An abuse of discretion occurs when a judicial act is untenable, clearly against reason, and works an injustice. *Id.* at 549–50 (quoting *McPherson Redev. Corp. v. Watkins*, 782 S.W.2d 690, 692 (Mo.App.1989)). Whether a videotape should be admitted or rejected depends on whether it is "practical, instructive, and calculated to assist the trier of fact in understanding the case." *Id.* at 550.

 Although evidence of subsequent repair is inadmissible to prove negligence, evidence incidentally showing remedial repairs may be admissible if offered for a purpose other than establishing an inference of negligence from the repairs. *Danbury v. Jackson County*, 990 S.W.2d 160, 165 (Mo.App.1999). "[E]vidence showing subsequent remedial measures may be admissible to show the condition of the accident site at the time the accident occurred." *Id.* The trial court should balance the need and probative value of such evidence against any possible prejudicial effect that may result from its admission. *See Egelhoff*, 875 S.W.2d at 549–50.

The remedial condition in the video of which CDI complains is the presence of a yellow tape, hung by CDI, around the hole through which Gomez fell. CDI argues that the sole purpose of the video was to show that someone was negligent and at fault for the accident. It claims the yellow tape shown in the video, which had "CAUTION" written on it, generally indicates a warning for a dangerous condition and was visible throughout the two minutes of video footage. A viewing of the video, however, reveals that the word "CAUTION" is mostly obscured because of the way the yellow tape is twisted around the accident scene.

In contrast to the photographs, the video clearly depicted many of the items and concepts discussed by both parties. For example, the jurors were able to see the heat exchanger, the pulleys and chains used to lift it, the grating, the scaffold that was being built, and the proximity in which the TMS and CDI employees were working. The trial court excluded the narration of the video. Instead, Frost testified in the plaintiff's case-in-chief as to what the video depicted, and he was subsequently cross-examined by CDI.

Despite CDI's argument that "the videotape did not in any way purport to reflect the condition of the accident scene or the grate flooring" when Gomez fell, the video serves exactly that purpose. The videotape was taken the next morning after the accident. The yellow tape was not mentioned during the testimony of the witnesses or in closing argument by Gomez's attorney.

The trial court did not abuse its discretion in admitting the videotape of the accident scene taken the next morning. Any possible prejudice to CDI by introducing it was far outweighed by its probative value.

## V.

 CDI claims that, because Gomez failed to file his acceptance of remittitur within the deadline prescribed by the trial court, the trial court erred in entering its amended order remitting the verdict. The belated filing, according to CDI, resulted in a new trial pursuant to the trial court's conditional grant of remittitur in its initial order and rendered the trial court without power to modify that conditional order. CDI further argues that Gomez's notice of appeal was untimely as measured from the May 24 order. CDI concludes by asserting that the trial court retains jurisdiction of the case, which must be remanded for a

new trial. As a corollary to this point on appeal, CDI filed a motion for remand to the trial court claiming that Gomez's untimely filing of his acceptance deprives this Court of jurisdiction.

CDI alleges that Gomez's faxed acceptance of the remittitur was not authorized by the Local Circuit Court Rules of Jackson County, as required by Rule 43.02, rendering it void *ab initio*. Rule 43.02 provides in pertinent part:

(b) The filing of pleadings and other papers with the court as required by Rules 41 through 101 shall be made by filing them with the clerk of the court, except that a judge may permit the papers to be filed with the judge, who shall note thereon the filing date and forthwith transmit them to the office of the clerk.

(c) By local court rule, a court ... may authorize the filing by facsimile transmission of such motions, applications, orders, warrants, pleadings and the like as may be deemed desirable. If filing by facsimile transmission is authorized by local rule, any pleading or other paper so filed shall have the same effect as the filing of an original document. . . .

CDI claims that Rule 43.02(c) should be read as prohibiting fax filing that is not expressly authorized by local circuit court rule. By its express terms, the rule simply does not make such a prohibition. Instead it authorizes circuit courts to adopt local rules to facilitate such filings.

Rule 43.02(b) expressly authorizes judges to accept filings. In this case the record reveals that the trial judge accepted Gomez's filing by facsimile, although he may not have been required to do so. The trial judge's action in this regard was appropriate and within his jurisdiction.

## VII.

■ CDI alleges the trial court committed error in denying its motion for JNOV or, in the alternative, motion for new trial and in refusing to enter further remittitur of compensatory damages because the judgment, even as remitted, is grossly excessive and demonstrates bias, passion, and prejudice on the part of the jury. CDI claims the award exceeds fair and reasonable compensation for Gomez's injuries because it is unsupported by the evidence and bears no relation to the damages proved at trial.

■ Section 537.068, RSMo 2000, permits a court to enter remittitur if, "after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." The purpose of section 537.068 is to further equitable compensation and to eliminate the retrial of lawsuits. *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 249 (Mo. banc 2001).

■ A trial court abuses its discretion when the remitted judgment remains grossly excessive so as to shock the conscience of the appellate court. *Id.* "An appellate court should exercise its power to interfere with the judgment of the jury and trial court with hesitation and only when the verdict is manifestly unjust." *Id.* at 249–50.

■ In determining whether a verdict is manifestly unjust, the evidence is reviewed in the light most favorable to the verdict. *Id.* at 250. "The nature and extent of the injuries sustained, diminished earning capacity, economic conditions, plaintiff's age, and a comparison of the compensation awarded in cases of comparable injury" are considered to determine whether the plaintiff received adequate

compensation for the injuries. *Id.* The award may also provide for certain intangibles that cannot be precisely calculated, like "past and future pain, suffering, effect on lifestyle, embarrassment, humiliation, and economic loss." *Id.* Each case must be evaluated on its particular facts, and the ultimate test is whether the award "fairly and reasonably compensates" the plaintiff for the injuries. *Id.*

██ Any judgment may be criticized as awarding too much or too little. The test, however, is whether the amount awarded is manifestly unjust. We cannot say that the remitted amount received by Gomez is manifestly unjust. He suffered permanent and serious physical and mental injuries from the fall. Because he testified, the trial court and the jurors were able to observe him and evaluate his credibility for themselves. The trial court's superior vantage point warrants a great latitude of discretion in determining whether and to what extent the verdict was supported by the evidence. There is nothing in the record that establishes that the trial court abused its discretion in remitting the jury verdict.

## VIII.

██ Gomez argues in his cross-appeal that the trial court erred in granting CDI's motion for remittitur because CDI committed fraud and deceived him and the trial court by not disclosing, in its response to interrogatories, an additional $2 million in insurance coverage until after the trial court entered its judgment. In response to this claim by Gomez, CDI filed motions to strike Gomez's reply brief and portions of his cross-appellant's brief and appendix.

Gomez cites no evidence in the record that he was prejudiced by CDI's late disclosure of its actual insurance coverage. The jury determined damages, and the trial court remitted those damages, based upon the evidence presented at trial. Insurance coverage, therefore, was not an issue.

The remittitur statute was designed to craft equitable compensation and to eliminate, if possible, the retrial of lawsuits. *Alcorn,* 50 S.W.3d at 249; *Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 656 (Mo.App.1997). While prejudice might exist if it were proved that inadequate disclosure affected a party's willingness to settle, that simply is not the case before us. The alleged fraud here did not directly alter the amount of damages Gomez received. As a matter of law, we cannot say that CDI forfeited its right to remittitur in this circumstance because of any failure to provide timely discovery.

Although a party claiming fraud during discovery should request appropriate relief when the alleged fraud is discovered, *Phipps v. Union Elec. Co.,* 25 S.W.3d 679, 681 (Mo.App.2000), Gomez alleges that CDI did not supplement its response until the filing of its notice of appeal and that, as a result, he had no opportunity to present the issue below. The record on appeal does not include sufficient facts to establish whether a violation occurred or, if so, whether it caused an increase in expense to or effort by Gomez. As a result, this opinion does not decide whether Gomez may pursue some form of collateral or other relief regarding this issue.

## IX.

The judgment of the trial court is affirmed.

All concur.